2015 IL App (1st) 131122

No. 1-13-1122
Opinion Filed March 13, 2015

FIFTH DIVISION

IN THE APPELLATE COURT

OF ILLINOIS

FIRST JUDICIAL DISTRICT

| | |
|---|---|
| KONI JOHNSON, | ) Appeal from the |
| | ) Circuit Court |
| Plaintiff-Appellant, | ) of Cook County |
| | ) |
| v. | ) |
| | ) |
| CHRISTINE PABIN BISHOF, M.D., Individually and as an | ) |
| Agent and/or Employee of Cook County, d/b/a John H. | ) |
| Stroger, Jr., Hospital; COOK COUNTY, d/b/a John H. | ) No. 08 L 006337 |
| Stroger, Jr., Hospital, by and Through its Agent and/or | ) |
| Employee, Christine Pabin Bishof, M.D.; JONATHAN | ) |
| BANKOFF, M.D., Individually and as an Agent and/or | ) |
| Employee of Cook County, d/b/a John H. Stroger, Jr., | ) |
| Hospital; and COOK COUNTY, d/b/a John H. Stroger, Jr., | ) |
| Hospital, by and Through its Agent and/or Employee, | ) Honorable |
| Jonathan Bankoff, M.D., | ) Kathy M. Flanagan, |
| | ) Judge Presiding. |
| Defendants-Appellees. | ) |

PRESIDING JUSTICE PALMER delivered the judgment of the court with opinion.
Justices McBride and Gordon concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff Koni Johnson filed an action against defendants Christine Pabin Bishof,

M.D., Jonathan Bankoff, M.D., and the County of Cook, doing business as John H.

Stroger, Jr., Hospital (the county) alleging negligence, negligent infliction of emotional

distress and violation of the Emergency Medical Treatment and Active Labor Act (EMTALA) (42 U.S.C. § 1395dd (2012)) in defendants' diagnosis and treatment of her in the emergency room of John H. Stroger, Jr., Hospital (Stroger Hospital). The court entered summary judgment for defendants on all counts asserted against them in plaintiff's fifth amended complaint. On appeal, plaintiff argues the court erred in granting summary judgment on (1) counts I and III, as defendants are not immune from liability under sections 6-105 and 6-106 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/6-105, 6-106 (West 2012)) (Tort Immunity Act) for their negligence in failing to appropriately treat her, (2) counts II and IV, as defendants are not immune from liability under the Tort Immunity Act for their negligent infliction of emotional distress on her and (3) count V, as questions of fact exist regarding whether she was given a medical screening examination within defendants' capability to provide and was stabilized before being discharged from the emergency room as required by EMTALA. We affirm.

¶ 2                                    BACKGROUND

¶ 3        This appeal concerns the trial court's grant of summary judgment to defendants on plaintiff's fifth amended complaint sounding in medical negligence, negligent infliction of emotional distress and violation of EMTALA.[1] Plaintiff filed the complaint in

---

[1] "[S]ection 1867 of the Social Security Act, codified at 42 U.S.C. § 1395dd [is] better known as the Emergency Medical Treatment and Active Labor Act (EMTALA)." *Arellano v. Department of Human Services*, 402 Ill. App. 3d 665, 675 (2010). A "limited 'anti-dumping' statute," EMTALA's " 'core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat.' " *Jinkins v. Evangelical Hospitals Corp.*, 336 Ill. App. 3d 377, 385 (2002) (quoting *Bryan v. Rectors & Visitors of the University of Virginia,* 95 F.3d 349, 351 (4th Cir. 1996)). To that end, EMTALA provides that any individual who comes to a hospital's emergency department requesting an

September 2009, directing counts I through V at defendants and counts VI through VIII at four codefendants. Only the five counts directed at defendants are at issue here.

¶ 4    In the complaint, plaintiff stated that she presented to the emergency room at Stroger Hospital, a hospital owned and operated by the county, on or about March 4, 2007, complaining of back spasms, numbness in her right lower extremity, cramping in her right thigh and severe pain in her back. Plaintiff had slipped on ice the previous day. She did not have medical insurance. Plaintiff alleged she was seen by Drs. Bishof and Bankoff, emergency room physicians at the hospital and agents and/or employees of the county. She asserted she complained to Drs. Bishof and Bankoff that her leg was numb, it felt like her leg was getting weak and she could not move her toes. She alleged that Drs. Bishof and Bankoff "did not perform a proper initial medical screening examination" on her, "ordered a Computerized Axial Tomography (CAT scan) only upon [her] insistence" and "failed to screen and treat [her] for a spinal cord injury." Plaintiff claimed Drs. Bishof and Bankoff accused her "of faking her injuries" and discharged her with Valium and a diagnosis of muscle spasm and did not give her any follow-up information or instructions upon discharge. She asserted that Drs. Bishof and Bankoff "had the duty to possess and apply the knowledge and use the skill of a reasonable well qualified emergency room physician under the same or similar circumstances." Plaintiff also stated that, on March 5, 2007, she presented to the emergency room at Lincoln

examination or treatment for a medical condition must be provided "an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition *** exists." 42 U.S.C. § 1395dd(a) (2012). If an emergency medical condition exists, then the hospital must stabilize the patient prior to transfer or discharge. 42 U.S.C. § 1395dd(b) (2012).

Park Hospital, from which she was discharged with a diagnosis of "numbness, possibly fictitious," and she then returned to the emergency room at Stroger Hospital, complaining of the inability to move her legs. She was diagnosed at Stroger Hospital with a spinal cord contusion and paralysis on March 6, 2007.

¶ 5 In counts I and III of plaintiff's fifth amended complaint, she asserted negligence claims against defendants. She claimed she suffered permanent injuries and lost earnings as a proximate result of defendants' negligent failure to do one or more of the following: (1) properly perform an initial medical screening examination; (2) properly screen her for her signs and symptoms; (3) properly treat her for her signs and symptoms; (4) properly treat her for a spinal cord injury; (5) properly consult with a neurologist or neurosurgeon for her signs and symptoms; or (6) refer her to a neurologist or neurosurgeon for treatment of her signs and symptoms."[2]

¶ 6 In counts II and IV, plaintiff asserted negligent infliction of emotional distress against defendants, alleging the same negligent acts and omissions as set forth in her negligence counts. She claimed she suffered and will continue to suffer permanent injuries, lost earnings and "severe mental and emotional anguish due to her injuries" as a proximate result of one or more of the negligent acts or omissions.

¶ 7 In count V, plaintiff asserted the county "had a duty to provide for an appropriate medical screening for [her] within the capability of [Stroger Hospital's] emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition existed" and

---

[2] Defendant's expert witness, neurologist Charles C. Wang, M.D., explained in his discovery deposition that "symptoms" are complaints of the patient while "signs" are the objective findings of a medical examination.

that it failed to provide her with an appropriate medical screening examination within the capability of the hospital's emergency department. She asserted the county was negligent in failing to (1) properly perform an appropriate medical screening examination pursuant to EMTALA or (2) properly stabilize, treat, and refer her to a neurologist or neurosurgeon in violation of EMTALA. Plaintiff sought damages for the permanent injuries she suffered as a proximate result of these negligent acts or omissions and for the severe mental and emotional anguish she allegedly suffered and will continue to suffer due to those injuries.

¶ 8    Defendants answered, denying the allegations. They filed affirmative defenses, asserting that, as a "local public entity" and employees of that public entity acting within the scope of their employment, they were immune from liability for any injury which may have been caused to plaintiff by their failure to diagnose or treat her condition pursuant to sections 6-105 and 6-106(a) of the Tort Immunity Act (745 ILCS 10/6-105, 6-106(a) (West 2012)).[3] The parties then conducted extensive discovery.

¶ 9    In plaintiff's discovery deposition, she testified that she slipped on a patch of ice

---

[3]    Section 6-105 provides:
"Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others." 745 ILCS 10/6-105 (West 2012).
Section 6-106(a) provides:
"(a) Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental or physical illness or addiction or from failing to prescribe for mental or physical illness or addiction." 745 ILCS 10/6-106(a) (West 2012).

on March 3, 2007, and fell flat on her back. The next day, she went to the emergency room at Stroger Hospital, complaining of back spasms, legs tingling and back pain. Dr. Bishof examined her but plaintiff could not recall what examinations Dr. Bishof performed. At some point, plaintiff received intravenous infusions of Valium and morphine for her pain and two X-rays were taken of her back. Plaintiff was then examined by Dr. Bankoff.

¶ 10    Plaintiff testified that Dr. Bankoff told her there was "nothing wrong" with her and she had to "get out of here." He stated "I don't know that you think you're up to" and told her "you're lying, you're faking." Plaintiff stated that, by this time, many hours after she first arrived in the emergency department, she could not walk but "they wouldn't listen to [her]." Plaintiff testified that Dr. Bankoff "kept insisting" that there was nothing wrong with her and that she could stand. He told her to stand and she "said no, I can't stand, no, I can't." He did not believe her when she said she could not stand. With plaintiff's boyfriend on one side and Dr. Bankoff on the other, they took plaintiff by the arms and stood her up. Dr. Bankoff then told her boyfriend "to let go," which he did, and plaintiff collapsed to the ground. Plaintiff testified that the doctor looked at her and told her "see how your legs are bent, because they are crossed like this, like sort of funny. He goes, no one does that, you know, when they just fall, really, you're doing yoga positions, so you're lying, you're doing yoga positions."

¶ 11    Plaintiff testified that a CAT scan was then taken and a "second male doctor" told her the results, telling her there was nothing wrong with her and "we're not going to do an MRI [magnetic resonance imaging] because you don't need one."[4] This second male

_____

[4] This "second male doctor" is not identified or named in plaintiff's complaint.

doctor then discharged her with instructions "to see a doctor, *** take it easy, take aspirin or something, if conditions get worse come back, but I couldn't walk, and they wouldn't listen to me, and he kept writing on the paper that I felt fine." She said, "I was told there was nothing wrong with me. The first doctor [Dr. Bankoff] *** said there was absolutely nothing wrong with me and made me stand up and fall on the ground, insisting there was nothing wrong with me. The second doctor kept insisting there was nothing wrong with me, and they sent me home saying there was nothing wrong with me."[5]

¶ 12    Plaintiff testified: "I didn't know what to do. I just wanted them to admit me and keep looking, find out what was wrong, believe me, to believe me, and they wouldn't believe me, and their treatment of me then too, and, yes, they did not go further with their tests that they could have performed." She stated she kept telling the doctors that she wanted them "to go further, is there anything else, because I knew there was something wrong," but did not request any specific tests. Plaintiff could not walk by this point and her boyfriend, aided by an orderly, had to lift her into his car. She went home and slept for a few hours. When she woke, she still could not stand, was in severe pain and could not urinate.

¶ 13    Plaintiff testified that her boyfriend then took her to Lincoln Park Hospital, where she was examined by Frederic Fishman, M.D.. Plaintiff stated Dr. Fishman told her there was nothing wrong with her, told her she had to leave and pushed her in her wheelchair into the waiting room while she was still crying and "told everybody that [she]

_____

[5] In contradiction to her earlier testimony, she stated that the second male doctor was the doctor "that kept saying I don't know what you think you're up to."

was a mental case and to get out of there or he would call the cops." Later the same day, plaintiff returned to Stroger Hospital. On this second visit to Stroger Hospital, plaintiff was evaluated by a neurosurgeon, an MRI was taken of her back, plaintiff was diagnosed with a spinal injury and she was admitted to the hospital. Plaintiff remained at Stroger Hospital for a week before being transferred to Oak Forest Hospital for inpatient rehabilitation.

¶ 14        Asked to explain the emotional distress "problem" she claimed resulted from her fall and treatment, plaintiff testified:

> "I have no self-confidence anymore. I feel very much that I have to defend myself or at least explain myself, say I'm sorry to anybody, that no one's going to believe me anyway, that I'm just kind of a phony, people don't put any trust or faith in me."

She stated she had regularly spoken to a psychologist at Oak Forest Hospital during her rehabilitation stay there after her transfer from Stroger Hospital and this doctor had told her she needed to continue seeing a psychologist after her discharge. Plaintiff was "still" taking Wellbutrin (an anti-anxiety medication) as prescribed to her by this doctor but was not seeing a psychologist as she could not afford one. She testified that, "a long time ago," before her fall, she had taken medication for depression.

¶ 15        The medical record of plaintiff's emergency room visit lists Dr. Bishof as the primary "MD/NP." It shows plaintiff was first "seen" in the emergency room shortly after 5 p.m. and discharged at 3 a.m. the next day. During her stay, she received multiple doses of pain killer Toradol, of Valium and of morphine. Dr. Bishof ordered two X-rays of plaintiff's spine, taken five hours apart. The X-rays showed "vertebral body and disc

height and alignment are preserved *** [and] no definite fracture" and "bony contours and joint spaces are seen to be within normal limits." The CAT scan ordered by Dr. Bishof showed "no acute fracture or dislocation," "vertebral body heights and intervertebral spaces are preserved" and "soft tissues are unremarkable." The discharge diagnosis written in the record is "back/buttock contusion s/p RH." The "instructions to patient" directed plaintiff to take the pain medication Motrin as prescribed, follow up with her primary care physician and "rest." The chart is signed by Dr. Bishof and Dr. Sergel, Dr. Bishof's attending physician. An emergency department "discharge" computer record lists the "primary discharge diagnosis" as "muscle spasm."

¶ 16    Dr. Bishof testified in her discovery deposition that she took a "complete history and physical" of plaintiff. She performed "a complete head-to-toe exam" of plaintiff, determining that plaintiff's neurological exam was "intact, plaintiff had no point tenderness over her back or bruising and had full range of motion at her hips, knees and ankles on her own and with Dr. Bishof "passively ranging her through motion." Dr. Bishof found plaintiff "had some tense paraspinal muscles in her low back" and seemed to be spasming in pain but her cranial nerves were intact, her tendon reflexes were normal, there was normal sensation in all four of her extremities and complete and full strength in all her extremities, and there were no signs of upper motor neuron problems.

¶ 17    Dr. Bishof testified that, after her physical examination of plaintiff, she ordered that plaintiff receive an anti-inflammatory and pain medication to help with her muscle spasms, Valium and, when plaintiff complained of pain, morphine. Dr. Bishof reassessed plaintiff several different times. When plaintiff complained that her right leg was getting weak, Dr. Bishof reassessed her but found "a normal exam." As a matter of

practice, she would have rechecked plaintiff's "deep tendon reflexes," the sensation and strength in her feet and her ability to move her legs. Dr. Bishof "did not find any physical objective findings" on her reexamination but, as plaintiff was complaining of new symptoms, Dr. Bishof ordered a CAT scan of plaintiff's spine. Dr. Bishof's shift then ended and she did not see plaintiff again.

¶ 18        Dr. Bishof testified that her initial impression of plaintiff's symptoms was "muscle spasm with possible contusion to her back from the fall," which was consistent with the symptoms of which plaintiff complained. Dr. Bishof remembered, however, that plaintiff "had some objective findings which were not consistent with the subjective findings [plaintiff's complaints]." Specifically, she remembered that plaintiff was complaining of numbness but "had a normal neurological exam, normal sensation and proprioception" and that she was moving around "so much" on the gurney, which Dr. Bishof considered inconsistent with being in pain. Dr. Bishof's impression was that plaintiff "had muscle spasm" causing her pain, numbness and cramping. Dr. Bishof noted that, at times, when she looked into plaintiff's cubicle while passing by, plaintiff appeared very comfortable and relaxed on the gurney but, "at other times when you would step into the room, she was writhing around on the cart." It was Dr. Bishof's impression that plaintiff seemed relaxed and comfortable when Dr. Bishof was not in the room.

¶ 19        Dr. Bishof stated her opinion that, at the time she saw plaintiff, plaintiff had not suffered any permanent injury to her spinal cord and was neurologically intact. Overall, based on all of plaintiff's complaints, it was Dr. Bishof's "impression that [plaintiff] had muscle spasm." Dr. Bishof came to a differential diagnosis that plaintiff had "contused a bone *** bruised a bone" and, when plaintiff's symptoms escalated, ordered a CAT scan

"to rule out any bony injury that may have not been picked up on the plain films." She remembered that she did not call in a neurologic consult because she and her attending physician, to whom she had conveyed plaintiff's history, the results of her physical exam of plaintiff and her impression regarding plaintiff's condition, did not think it was indicated. She would also have spoken to her attending physician about "the plan for evaluation and treatment."

¶ 20      Dr. Bishof's shift ended at midnight and her chief resident, Dr. Bankoff, took over plaintiff's care. The last Dr. Bishof knew, plaintiff was being sent for a CAT scan. She did not discharge plaintiff and was not the one who wrote the "discharge diagnosis" into plaintiff's medical record. Dr. Bishof stated it was her custom and practice to give an oral report to the doctor taking over a patient's care but she did not specifically remember giving Dr. Bankoff an oral report on plaintiff. Dr. Bishof asserted she did not believe plaintiff was "faking her injuries" and she had never accused plaintiff of doing so.

¶ 21      Dr. Bankoff testified in his discovery deposition that he did not remember plaintiff and had no recollection of any conversation with her but her medical records showed he examined her in the Stroger Hospital emergency department in the early morning on March 5, 2007. He assumed he received the customary briefing on this patient from the "off-going" team of residents at the change of their shift but he could not specifically recall the briefing he received on that shift. From the medical records, he knew he attended to her twice, gave her a prescription for Motrin and, although he documented that she "had subjective back pain with numbness and [was] unable to walk subjectively," his "normal neurologic exam" did not objectively find numbness. He did not remember performing the exam or what it had entailed. He did not know whether he

asked plaintiff to stand or walk and whether she complied. As was his custom and practice, he would have written plaintiff's discharge order and clarified any discharge instructions with her but another doctor would "actually" discharge her. He knew from the medical record that a CAT scan of plaintiff was "negative" but did not know who wrote this note in the record. Although the medical record stated plaintiff's "primary discharge diagnosis" as muscle spasm, Dr. Bankoff stated it was not his diagnosis. He did not remember plaintiff at all, had no recollection of anything other than what he had written in the medical record and had no memory of asking plaintiff to stand or of accusing her of faking her injury.

¶ 22     Plaintiff's expert witness, emergency room physician Kenneth A. Corre, M.D., testified in his deposition that the county/Stroger Hospital violated EMTALA. He stated the basis for his opinions was "[t]hat the patient presented to Stroger Hospital did not have an appropriate or complete medical screening exam, [and[ that she, in fact, did have an emergency medical condition [a 'spinal cord contusion with neurologic findings'] which was not assessed nor treated or dispositioned appropriately." Dr. Corre opined that plaintiff did not receive a "complete medical screening"  or "subsequent appropriate testing or diagnosis" and "should have been hospitalized and received immediate consultation [by a spine specialist, neurosurgeon or neurologist] and treatment that would have been part of that hospitalization." He stated plaintiff should have been immediately immobilized with her spine stabilized and should have received "high-dose steroids."

¶ 23     Dr. Corre stated that, when plaintiff presented to Stroger Hospital on March 4, 2007, the emergency medical screening examination required a complete and detailed

history, a complete and detailed physical exam, imaging which included an MRI of the spine, "stat" consultation with a spine specialist, immobilization and stabilization of the spine, intravenous high-dose steroids, hospitalization of plaintiff as opposed to her being discharged home and "the diagnosis of spinal injury, in particular spinal cord contusion, be made." It was his opinion that Dr. Bishof's initial medical screening, including her failure to schedule an MRI, and physical examination of plaintiff were inadequate and below the standard of care as plaintiff presented with an obvious spinal cord injury that should have been diagnosed by Dr. Bishof as an emergency medical condition requiring immobilization, an MRI, consultation with a spine specialist and hospital admission. Instead, as a result of Dr. Bishof's inadequate examination and testing, she diagnosed plaintiff with a muscle spasm, which diagnosis was accepted by Dr. Bankoff after he received the results of a CAT scan on plaintiff and led to plaintiff's discharge from the hospital with after-care instructions appropriate for a muscle spasm. Dr. Corre stated the after-care instructions were "absolutely not" the appropriate instructions for treatment of plaintiff's spinal cord injury. He asserted that her type of spinal cord injury presented an emergency medical condition and would not have necessitated after-care instructions given that, "by standard of care and EMTALA," she would have been "admitted, treated, immobilized, et cetera." Dr. Corre asserted that the instructions plaintiff received were related "to the diagnosis of back or buttock contusion only" and, if given for something more severe such as a spinal cord contusion or injury, were "woefully inadequate and substandard." Dr. Corre stated that, taking together plaintiff's complaints, the mechanism of her injury, the results of the physical examination and the failure to carry out "a complete and standard exam," "they clearly

did not take this patient seriously, and I believe that they also clearly violated patient safety."

¶ 24    Plaintiff's other expert witness, neurologist Adrian Richard Mainwaring Upton, M.D., stated that, based on his review of plaintiff's medical records and his examination of plaintiff, she had suffered a contusion of the spinal cord as a result of her fall. After discussing plaintiff's signs and symptoms, Dr. Upton stated he did not know how Dr. Bishof "could even begin to suggest" that plaintiff's numbness was due to muscle spasm and found this to be "quite frankly nonsense." Dr. Upton opined that Dr. Bishof did not perform a thorough screening evaluation to determine whether or not a spinal cord injury existed and she should have made a probable diagnosis of spinal cord injury and treated plaintiff for such. He felt that the combination of Dr. Bishof's failure to order an MRI, failure to request a neurological opinion, failure to administer the steroid methyl prednisone and failure to immobilize plaintiff comprised a deviation from the standard of care which aggravated a preexisting condition suffered by plaintiff. Dr. Upton noted that Dr. Bishof did not write a diagnosis in the record.

¶ 25    Dr. Upton stated his opinion that Dr. Bankoff also deviated from the standard of care as Dr. Bankoff "was prepared to help discharge the patient when no diagnosis was made and a probable spinal cord lesion had been missed." He stated Dr. Bankoff failed to perform a proper screening evaluation to determine whether spinal cord injury existed, did not order an MRI and did not consult a neurologist or neurosurgeon. Dr. Upton testified that Dr. Bankoff was the individual who diagnosed plaintiff with a "back and buttock contusion status post-fall." He stated that, although this was not an incorrect diagnosis, "what [Dr. Bankoff] didn't do was find out why she had the

neurological symptoms which was the spinal cord swelling as a result of the fall." Dr. Bankoff should have gone further and considered the possibility that plaintiff had suffered a spinal lesion, not merely a back and buttock bruising. Dr. Upton stated the after-care instructions given to plaintiff were not treatment for a spinal cord injury and would not have been of any benefit to plaintiff in preventing her from progressing from bruising to paraplegia. It was Dr. Upton's opinion that any of the doctors responsible for the care and treatment of plaintiff should have, based on plaintiff's signs and symptoms, "worked her up [(diagnosed her)] for a contused spinal cord, had an MRI done, delivered the steroids," as was the standard treatment for spinal cord injuries in general. He found the evidence "obvious" that plaintiff had a contused spine and an MRI, although not used to make a diagnosis, would have confirmed or denied the clinical diagnosis. The painkillers prescribed for plaintiff upon discharge would have eliminated plaintiff's pain and improved her back if she "only" had a contused back but her numbness indicated that it was very unlikely that she only had a contused back.

¶ 26        Retired Oak Forest Hospital clinical psychologist Malcolm J. Brachman, Jr., Ph.D., testified that he visited plaintiff once during her admission to the spinal cord injury rehabilitation unit at Oak Forest Hospital in 2007. Plaintiff's Oak Forest Hospital medical records showed that, as with any patient admitted to the rehabilitation unit, plaintiff had received a psychological screening. Plaintiff's medical records showed a staff psychologist diagnosed plaintiff as suffering from depression and anxiety, a staff psychiatrist found plaintiff had a history of "major depressive disorder with psychosis" and "psychosis with depression" and might possibly suffer from "bipolar disorder," and plaintiff told a staff social worker that she had suffered from depression since the age of

21, for more than 20 years. During plaintiff's stay at Oak Forest Hospital, a predoctoral psychology intern conducted six therapy sessions with plaintiff. Dr. Brachman stated that he went to talk to plaintiff once, after she had expressed suicidal ideation to her therapist. Dr. Brachman opined that, based on his general understanding of rehabilitation patients and given plaintiff's prior history of depression or "mental condition," her "traumatic injury" "probably exacerbated" her existing mental condition.

¶ 27    Defendant's expert witness, neurologist Charles C. Wang, M.D., testified in some detail regarding plaintiff's signs and symptoms and opined Dr. Bishof did "a complete head-to-toe," "pretty thorough" examination involving "neuro" and "deep tendon reflexes." He considered it "pretty good for an emergency physician in terms of neurologic examination." He stated Dr. Bishof found a "normal exam," Dr. Bankoff's discharge diagnosis was back/buttock contusion and the emergency department's working diagnosis was muscle spasm with possible contusion to plaintiff's back from the fall. Dr. Wang thought the likely cause of plaintiff's complaints was spinal cord contusion. Regarding plaintiff's complaint to Dr. Bankoff that she could not walk, Dr. Wang stated he would expect a reasonably qualified physician under those circumstances to have the patient walk.

¶ 28    In October 2011, defendants moved for summary judgment on negligence counts I and III. Pointing out that plaintiff's experts testified that Drs. Bishof and Bankoff failed to perform diagnostic examinations and tests and to diagnose or treat a spinal cord injury/spinal cord contusion (SCI/SCC), defendants argued that they were entitled to judgment as matter of law under sections 6-105 and 6-106(a) of the Tort Immunity Act. Plaintiff responded that defendants were not immune from liability on counts I and III as

her allegations were "primarily rooted" in defendants' failure to perform an initial medical screening, screen her for her signs and symptoms, properly treat her for her signs and symptoms and properly consult with or refer her to a neurologist or neurosurgeon, *i.e.*, were rooted in defendants' negligent and inadequate treatment of the injuries, signs and symptoms as diagnosed by defendants for which there was no immunity pursuant to sections 6-106(c) and (d) of the Tort Immunity Act.

¶ 29    The court granted defendants' motion for summary judgment on counts I and III on January 27, 2012. It found that defendants diagnosed plaintiff "with a back/buttocks contusion and treated her for the erroneous diagnosis," "failed to correctly diagnose her spinal cord injury, which required different treatment and was delayed due to the misdiagnosis" and "failed to perform the tests which would have led to the proper diagnosis." The court determined that "[t]he claim against the Defendants here is, in essence, based on their failure to perform an adequate examination and their failure to diagnose the Plaintiff's spinal cord injury, rather than their negligence in treating the spinal cord injury." It found defendants were, therefore, immunized from liability from the negligence alleged in counts I and III pursuant to sections 6-105 and 6-106 of the Tort Immunity Act and summary judgment on those counts was warranted.

¶ 30    The county moved for summary judgment on the EMTALA count V, asserting that it was immune from liability for any failure to perform an appropriate medical screening examination under the Tort Immunity Act and that EMTALA did not preempt the Tort Immunity Act. It also argued that plaintiff presented no evidence to show that any member of the Stroger Hospital emergency department staff had determined plaintiff had an emergency medical condition or had intended to discharge an unstable

patient in violation of EMTALA. In support of its motion, the county presented the deposition of its expert emergency medicine physician, Richard M. Feldman, M.D. Although Dr. Feldman agreed that Drs. Bishof and Bankoff had "missed the diagnosis" of plaintiff's spinal cord injury and plaintiff was not stabilized when she was discharged "the first time from Stroger Hospital," he found plaintiff's "EMTALA issue" was "a nonstarter." He testified:

"There is a well [*sic*] beyond the medical screening exam for this patient, the fact that there was a diagnosis made that turned out to be not as severe as the diagnosis she eventually had, EMTALA has nothing to do with whether or not you make the correct diagnosis. It has to do with whether you treat the patient as you would treat every other patient that presents a similar type symptomography.

Pain medicine, X-rays, observation, more pain medicine, CAT scan is needed, disposition accordingly, but in terms of the patient being treated as any other patient would be[,] she was for the set of symptoms she had. The fact that they didn't go further with an MRI has to do with clinical judgment. Has nothing to do with the desire on the part of the doctors or institution not to care for the patient appropriately as they would with every other patient."

Plaintiff responded to the motion, arguing that EMTALA did preempt the Tort Immunity Act and that questions of material fact existed regarding whether the county violated EMTALA and whether, as required by EMTALA, she was given a medical screening and ancillary services within the capability of Stroger Hospital's emergency department and

stabilized before being discharged.

¶ 31    The court granted the county's motion for summary judgment on July 27, 2012. It held that sections 6-105 and 6-106 of the Tort Immunity Act directly conflict with EMTALA and EMTALA therefore preempts the Tort Immunity Act such that the requirements of EMTALA apply to the county.[6] It then held that there was no evidence to show that the county violated EMTALA at the time of plaintiff's emergency room visit to Stroger Hospital. The court explained there was no evidence that the screening plaintiff received at Stroger Hospital deviated in any way from the hospital's own standard screening procedures or that plaintiff was treated any differently from other patients based on her lack of insurance or inability to pay. It, therefore, found no evidence to support a violation of EMTALA with regard to whether the county performed an appropriate screening examination under the statute. The court also found that, as plaintiff was not diagnosed with an emergency medical condition, Stroger Hospital had no duty to provide necessary stabilizing treatment under EMTALA.

¶ 32    Defendants then moved for summary judgment on the negligent infliction of emotional distress counts II and IV pursuant to section 6-109 of the Tort Immunity Act (745 ILCS 10/6-109 (West 2012)).[7] They argued that the gist of these claims was that defendants were liable for failing to admit plaintiff to the hospital and they were immune from failure to admit under section 6-109. The court granted the motion for summary

---

[6] EMTALA provides that its provisions "do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f) (2012).

[7] Section 6-109 provides that local public entities and their employees acting in the scope of their employment are immune from liability "for an injury resulting from the failure to admit a person to a medical facility operated or maintained by a local public entity." 745 ILCS 10/6-109 (West 2012).

judgment on February 1, 2013. It found section 6-109 of the Tort Immunity Act was inapplicable but that defendants were immunized from liability on counts II and IV pursuant to sections 6-105 and 6-106 as these counts were "not pled" as claims for negligent infliction of emotional distress but rather were identical to counts I and III sounding in medical malpractice, adding only an allegation of emotional distress as an element of damages. The court held that, as the negligent infliction of emotional distress counts II and IV stemmed from the same failure to adequately examine, test and diagnose plaintiff asserted in counts I and III and the allegations in counts II and IV were identical to those stated in counts I and III, defendants were immunized from liability pursuant to sections 6-105 and 6-106.

¶ 33        On March 5, 2013, the court entered an order finding there was no just reason to delay enforcement or appeal of the February 27, 2012, July 27, 2012, and February 1, 2013, orders granting summary judgment to defendants on counts I through V. It declared the orders final and appealable pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010). On March 27, 2013, plaintiff filed her timely notice of appeal from the March 5, 2013, finality order and the three underlying summary judgment orders.

¶ 34                                        ANALYSIS

¶ 35        Plaintiff raises three issues on appeal challenging the court's grant of summary judgment to defendants on all counts against them. She argues: (1) defendants are not immune from liability under sections 6-105 and 6-106 of the Tort Immunity Act for their negligent failure to appropriately treat plaintiff as alleged in counts I and III; (2) defendants are not immune from liability under sections 6-105 and 6-106 of the Tort Immunity Act for their negligent infliction of emotional distress caused to plaintiff by their

treatment of her as alleged in counts II and IV; and (3) questions of material fact exist regarding whether, as asserted in count V, the county/Stroger Hospital failed to provide plaintiff with a medical screening examination within the capability of the hospital's emergency department and to stabilize her prior to discharge as required by EMTALA. We do not consider whether the delay in treatment between plaintiff's first and second visit to Stroger Hospital was the cause of her injuries or the extent of her damages as the issues of causation and damages are not before us.

¶ 36    Summary judgment is a drastic means of disposing of litigation and should be granted only when " ' "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ' " *Axen v. Ockerlund Construction Co.*, 281 Ill. App. 3d 224, 229 (1996) (quoting *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986), quoting Ill. Rev. Stat. 1983, ch. 110, ¶ 2-1005(c)). The purpose of summary judgment is not to try a question of fact but to determine whether one exists or whether reasonable people could draw different inferences from the undisputed facts. *Golden Rule Insurance Co. v. Schwartz*, 203 Ill. 2d 456, 462 (2003); *Wood v. National Liability & Fire Insurance Co.*, 324 Ill. App. 3d 583, 585 (2001). We review the trial court's decision on a motion for summary judgment *de novo*, construing the pleadings, depositions, admissions and affidavits strictly against the moving party and liberally in favor of the respondent. *Golden Rule Insurance Co.*, 203 Ill. 2d at 462; *Gauthier v. Westfall*, 266 Ill. App. 3d 213, 219 (1994).

¶ 37                                    1. Counts I and III – Negligence

¶ 38    At issue first is the trial court's grant of summary judgment to defendants on

counts I and III of the fifth amended complaint. The court found defendants, a local public entity and two of its employees, immune from liability under sections 6-105 and 6-106 of the Tort Immunity Act for the negligence asserted in those counts.[8]

¶ 39     As noted *supra*, section 6-105 provides:

> "Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others." 745 ILCS 10/6-105 (West 2012).

"By its plain terms, section 6-105 provides immunity from liability to a local public entity and its employees who have failed to make a physical or mental examination, or who have failed to make an adequate physical or mental examination." *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 505 (2000).

¶ 40     Section 6-106(a) provides:

---

[8]  "In a negligence medical malpractice case, the burden is on the plaintiff to prove the following elements of a cause of action: the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician's want of skill or care." *Purtill v. Hess*, 111 Ill. 2d 229, 241-42 (1986). "Unless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard." *Id.* at 242. Illinois courts follow the "similar locality" rule in determining the standard of care against which the defendant physician's alleged negligence is judged. *Id.* Under this rule, a physician must possess and "apply that degree of knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case under similar circumstances." *Id.*

"Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental or physical illness or addiction or from failing to prescribe for mental or physical illness or addiction." 745 ILCS 10/6-106(a) (West 2012)

By its plain language, section 6-106(a) provides immunity from liability to a local public entity and its employees "for injury resulting from: (1) a diagnosis that a person is afflicted with a mental or physical illness or addiction; (2) failing to diagnose that a person is afflicted with a mental or physical illness or addiction; and/or (3) failing to prescribe for a mental or physical illness or addiction." *Michigan Avenue National Bank*, 191 Ill. 2d at 510.

¶ 41    The trial court stated its basis for granting summary judgment to defendants on their sections 6-105 and 6-106(a) immunity defense as follows: "The claim against the Defendants here is, in essence, based on their failure to perform an adequate examination and their failure to diagnose the Plaintiff's spinal cord injury, rather than their negligence in treating the spinal cord injury." Plaintiff acknowledges that defendants would be immune from liability for failing to make a diagnosis but asserts defendants are not immune from liability for negligent treatment and that she has alleged such here.

¶ 42    Plaintiff correctly points out that section 6-106 is not meant to grant blanket immunity for negligent treatment of a specific medical condition. *Michigan Avenue National Bank*, 191 Ill. 2d at 511. As our supreme court explained in *Michigan Avenue National Bank*, 191 Ill. 2d at 511:

"Although subsection (a) of section 6-106 grants immunity for diagnosing, or failing to diagnose, that a person is afflicted with a physical illness, the remaining subsections of section 6-106 contain limitations on immunity where it is alleged that a local public entity and its public employees have caused a person to suffer injury due to the negligent prescription of treatment and/or the negligent administration of treatment. Specifically, subsection (b) of section 6-106 provides that a local public entity and its public employees are vested with immunity where they administer treatment prescribed for mental or physical illness or addiction, so long as such treatment is administered with 'due care.' 745 ILCS 10/6-106(b) (West 1992). Subsection (c) of section 6-106 states that defendants are not immunized where, having undertaken to prescribe for mental or physical illness or addiction, they have proximately caused an injury to a patient due to negligence or wrongful acts in so prescribing. 745 ILCS 10/6-106(c) (West 1992). Finally, subsection (d) of section 6-106 provides that defendants are liable for injury proximately caused by their negligent acts or omissions in the administration of any treatment prescribed for mental or physical illness or addiction. 745 ILCS 10/6-106(d) (West 1992)."

¶ 43        It is on the basis of these limitations on immunity that plaintiff asserts defendants are not immune from liability for their negligence here. Asserting that defendants erroneously diagnosed her with only a back injury and began to treat her for this with pain medication alone, plaintiff claims that, as alleged in her fifth amended complaint

and shown by the expert testimony, "this is not a failure to diagnose case but instead a negligent and inadequate treatment situation," for which, pursuant to sections 6-106(b), (c) and (d), defendants are not immunized. She argues that, contrary to the trial court's finding, the essence of her claim does not stem from defendants' failures to adequately examine, test and diagnose her, for which she acknowledges defendants would be immune under section 6-106(a). Instead, she asserts her claim arises from defendants' "failure to properly perform an initial medical screening examination, screen the Plaintiff for her deteriorating signs and symptoms, properly treat the Plaintiff for those signs and symptoms, and properly consult with or refer the Plaintiff to a neurologist or neurosurgeon," for which defendants would not be immunized. Plaintiff claims the court erred in finding immunity where defendants diagnosed plaintiff while still in their emergency room and began administering treatment to her but did so in a negligent manner. Citing to *American National Bank & Trust Co. of Chicago v. County of Cook*, 327 Ill. App. 3d 212 (2001), she argues that it was this treatment and the subsequent inadequate examinations and prescription of treatment that were negligent and defendants, therefore, were not immune under the Tort Immunity Act.

¶ 44    In *American National Bank & Trust Co.*, during a prenatal examination, doctors at a Cook County hospital clinic diagnosed the plaintiff with a "transverse lie" of her baby, meaning the baby could not delivered vaginally. They prescribed regular monitoring of plaintiff and the regular performance of assorted medical tests to determine the baby's position and whether a caesarean section would be required to deliver the baby. Doctors consistently performed the prescribed tests and verified that the baby was in the transverse lie position. However, shortly before the plaintiff went into labor, one of

25

the defendant doctors determined, incorrectly and without performing the prescribed tests, that the baby was no longer in the transverse lie position. When the plaintiff went into labor, the baby was undeliverable due to its birth position. An emergency caesarean section was performed but the baby suffered brain damage. The defendants argued they were immune from liability under sections 6-105 and 6-106. The court disagreed.

¶ 45     The court found the doctor's actions in failing to determine that the baby was still in a transverse lie position was not a "diagnosis" for which the defendants would be immune under section 6-106(a) as the doctor had not examined the plaintiff in order to investigate, analyze or determine her medical condition. *American National Bank & Trust Co.*, 327 Ill. App. 3d at 217. Instead, it found the doctor was already aware of the plaintiff's medical condition, specifically the existing "transverse lie" diagnosis, and the doctor's actions consisted of "treating" by caring for and managing the previously diagnosed known condition. *Id.* The court stated that, once the initial diagnosis of transverse lie was made, each subsequent prenatal examination did not involve a separate and independent diagnosis to determine whether the baby was still in a transverse lie position. *Id.*

¶ 46     The court explained, " 'once diagnosis of a medical condition is made and treatment of that condition is prescribed and undertaken, any subsequent diagnosis required to be made as a result of that treatment, such as with respect to complications arising from medications prescribed or medical procedures performed, may not be entitled to the immunity protection of section 6-106(a).' "[9] *American National Bank &*

_____

[9]  The court used the definitions of "diagnosis" and "treatment" set forth by our

*Trust Co.,* 327 Ill. App. 3d at 219 (quoting *Michigan Avenue National Bank,* 306 Ill. App. 3d at 402). For example, treatment of the diagnosed illness might require further medical testing in order to diagnose and treat any additional medical conditions that result from the treatment prescribed for the diagnosed medical condition. *Id.* at 220.

" 'The making of the subsequent diagnosis would become part of the treatment prescribed for the medical condition initially diagnosed; and there would be no immunity if the subsequent diagnosis was incorrectly made (a negligent or wrongful act) or if the diagnosis was not made at all (an act of omission).' " *Id.* at 219 (quoting *Michigan Avenue National Bank,* 306 Ill. App. 3d at 403). "Following the same logic ***, once diagnosis of a medical condition is made and treatment of the condition is prescribed and undertaken, any subsequent prescription or examination required to be made pursuant to that condition is part of the patient's treatment." *Id.* at 220.

¶ 47    The court stated that the plaintiff had been diagnosed with transverse lie prior to her examination by the doctor and the prescribed treatment for her condition consisted

supreme court in *Michigan Avenue National Bank v. County of Cook,* 306 Ill. App. 3d 392 (1999). Giving the term "diagnosis" as used in section 6-106(a) it's plain and ordinary meaning as gleaned from assorted dictionaries, the supreme court found it to mean, among other things, the "art or act of identifying a disease from its signs and symptoms, and as an investigation or analysis of the cause or nature of a condition, situation, or problem," as well as "the art of distinguishing one disease from another," "the determination of the nature of a case of disease" and "[t]he determination of a medical condition (such as disease) by physical examination or by study of its symptoms." (Internal quotation marks omitted.) *Michigan Avenue National Bank*, 191 Ill. 2d at 510.

    It found "treatment" as used in section 6-106(a) to mean, "the action or manner of treating a patient medically or surgically" and "[t]he care of a sick person, and the remedies or means employed to combat the disease affecting him" as well as "[t]he management and care of a patient for the purpose of combating disease or disorder" and "[t]he medical or surgical management of a patient." (Internal quotation marks omitted.) *Michigan Avenue National Bank*, 191 Ill. 2d at 511-12.

of regular monitoring of her condition, testing and manual maneuvers to determine the baby's position and whether a Caesarean section would be required. The doctor's alleged failure to schedule or perform such testing or manipulation constituted an act of omission in administering the plaintiff's prescribed treatment for her previously diagnosed condition. *American National Bank & Trust Co.*, 327 Ill. App. 3d at 220. "Under section 6-106(d), in the course of administering the treatment prescribed there is no immunity if the subsequent prescription or examination was incorrectly made (a negligent or wrongful act) or if the prescription or examination was not made at all (an act of omission)." *Id.* The court found the doctor's conduct was, therefore, afforded no immunity under section 6-106(d). *Id.*

¶ 48        Plaintiff asserts Dr. Bishof diagnosed plaintiff with a muscle spasm with possible back contusion and then began administering treatment to her for her injuries based on that diagnosis by administering pain medication and "nothing" for her muscle spasm. Plaintiff claims that Dr. Bishof had, at this point, begun treatment for plaintiff's condition, prescribed treatment in the form of pain medicine and the orders for X-rays and had undertaken the treatment as the pain medication was in fact administered. She argues that, as a result, following *American National Bank & Trust Co.*, any subsequent prescription or examination required to be made pursuant to that condition is part of plaintiff's treatment for purposes of analysis under the Tort Immunity Act. Plaintiff claims that Dr. Bankoff then continued to treat her for the injuries previously diagnosed by Dr. Bishof by examining her, administering additional pain medication and, upon discharge, providing her with a prescription for another pain medication. Plaintiff argues that this evidence shows defendants undeniably began treating plaintiff for the injuries they

diagnosed as well as for her signs and symptoms and, therefore, once defendants undertook and prescribed her treatment, they were not immune from negligent treatment, negligent prescription of treatment, inadequate treatment, omission in administering treatment or failure to make subsequent examinations of plaintiff.

¶ 49    Contrary to plaintiff's argument, this is not a case where the defendants negligently prescribed and administered treatment to the plaintiff after a correct diagnosis as in *American National Bank & Trust Co.* It is, instead, a failure to diagnose case, as the trial court correctly found. All of plaintiff's claims of negligent treatment are directed to defendants' improper treatment of her spinal cord injury. Defendants treated plaintiff for her signs and symptoms but consistently diagnosed those signs and symptoms as muscle spasm and back/buttock contusion, not spinal cord injury.

¶ 50    Taking Drs. Bishof's and Bankoff's administration of Valium and pain medication as "treatment" for plaintiff's diagnosed condition, that diagnosed condition was always "muscle spasm" with possible back/buttock contusion. Dr. Bishof testified that this was her initial impression, was her "final" impression after her multiple examinations, observations and testing of plaintiff and was verified by her attending physician. When the results of the CAT scan ordered by Dr. Bishof came back "normal," Dr. Bankoff confirmed Dr. Bishof's initial impression that plaintiff suffered from back/buttock contusion. After numerous examinations, observations and tests, defendants ruled out spinal cord injury as a diagnosis and settled on muscle spasm and a discharge diagnosis of back/buttock contusion. Spinal cord or neurological injury was never a differential diagnosis. In retrospect, defendants were wrong and plaintiff did have a spinal cord injury. They misdiagnosed her. However, as our supreme court explained in

*Michigan Avenue National Bank*, a misdiagnosis is a "wrong or mistaken diagnosis" for which defendants are immune from liability under section 6-106(a). (Internal quotation marks omitted.) *Michigan Avenue National Bank*, 191 Ill. 2d at 514.

¶ 51    Having ruled out a neurological injury, defendants consistently treated plaintiff for the muscle spasm and back/buttock contusion injury with which they had misdiagnosed her. There is no evidence that the treatment defendants provided for the signs and symptoms they attributed to muscle spasm and back/buttock contusion was negligent for that diagnosis. In other words, there being no evidence to the contrary, defendants treated the wrong diagnosis correctly. Defendants' arguably proven negligence was in their failure to perform adequate medical examinations or testing leading to their failure to diagnose plaintiff's spinal cord injury, for which they are immune from liability under sections 6-105 and 6-106(a). Although, according to plaintiff's expert witnesses, defendants should have immobilized plaintiff, hospitalized her, administered steroids, consulted a neurosurgeon or neurologist and ordered an MRI for her spinal cord injury, the reality is that defendants did not diagnose a spinal cord injury and those additional treatments and testing were not indicated for the muscle spasm and back/buttock contusion with which they diagnosed her. The treatment defendants provided to plaintiff was appropriate for the injury with which they diagnosed her and they are immune from liability for that misdiagnosis. *Michigan Avenue National Bank*, 191 Ill. 2d at 514. Unlike in *American National Bank & Trust Co.*, there is no evidence that the treatment provided to plaintiff was inadequate or negligent for the diagnosis. The fact that the muscle spasm diagnosis was incorrect or inadequate does not, without more, make defendants' treatment for that diagnosis negligent. The fact that the treatment was the wrong

treatment for spinal cord injury would be relevant only if defendants had diagnosed plaintiff with a spinal cord injury. They had not. They diagnosed her with a muscle spasm and possible back/buttock contusion and treated her solely for that.

¶ 52      Plaintiff's argument is similar to that raised by the plaintiff in *Michigan Avenue National Bank*. There, the plaintiff, the special administrator of the estate of Cynthia Collins, characterized its lawsuit as grounded in the defendants' failure to administer proper treatment to Collins after determining that Collins suffered from a specific medical condition and argued the defendants were, therefore, liable under sections 6-106(b), (c) and (d). Doctors at a Cook County hospital had diagnosed Collins with fibrocystic breast disease and advised her to return in three months. During subsequent visits to the hospital's emergency room for other ailments, including a pain in her breast, the doctors consistently failed to diagnose that Collins suffered from breast cancer. At another hospital, Collins was diagnosed with the cancer and died from it. The plaintiff filed a two-count complaint against the defendants, alleging their negligence in failing to order a mammogram, failing to adequately perform tests and examinations, failing to perform a biopsy, failing to diagnose Collins' breast cancer and failing to administer proper and necessary medical and nursing care to Collins. *Michigan Avenue National Bank*, 191 Ill. 2d at 499. The trial court granted summary judgment to the defendants pursuant to sections 6-105 and 6-106(a) of the Tort Immunity Act and the appellate and supreme courts affirmed.

¶ 53      The supreme court found the allegations made in the plaintiff's complaint contradicted its assertion that its action was premised upon the defendants' negligent treatment of Collins. *Michigan Avenue National Bank*, 191 Ill. 2d at 513. It found,

instead, that "the gravamen of plaintiff's action against defendants is that defendants' failure either to perform examinations or to adequately perform examinations led to defendant's failure to diagnose Collins' breast cancer, which, in turn, proximately caused her death" and, therefore, "the immunity provided to local public entities and their public employees in section 6-105 and subsection (a) of section 6-106 applies." *Michigan Avenue National Bank*, 191 Ill. 2d at 512. The plaintiff had alleged that the defendants' negligent misdiagnosis of fibrocystic breast disease had prevented the discovery of Collins' breast cancer and was the proximate cause of her death. Noting that " '[m]isdiagnosis' is defined as a 'wrong or mistaken diagnosis' " (*id.* at 514 (quoting Stedman's Medical Dictionary 973 (25th ed. 1990))), the court held that, "[b]ecause [section 6-106(a)] immunizes defendants 'from diagnosing or failing to diagnose' that a person has a physical illness, plaintiff's attempts to characterize its lawsuit as a case of 'misdiagnosis' does not remove its action from the ambit of [section 6-106(a)]" (*id.*).

¶ 54    The court also found the plaintiff's argument that its cause was an action for negligent treatment rather than failure to diagnose was not supported by the deposition testimony of the plaintiff's own experts, noting there was no testimony by the experts that fibrocystic breast disease is treatable, that any treatment of Collins' fibrocystic breast disease occurred or that there was negligence in the course of treatment. The court concluded:

"The criticisms lodged against defendants by plaintiff's experts *** focused upon the failure to perform certain examinations, such as a mammogram, ultrasound or biopsy. This failure, in turn, led to defendants' failure to diagnose Collins' breast cancer, which, the experts surmised, had

coexisted with Collins' fibrocystic condition. Section 6-105 immunity applies to defendants' alleged failure to conduct physical examinations in order to evaluate whether Collins suffered from breast cancer in addition to fibrocystic condition. In addition, because defendants rendered no medical treatment to Collins in relation to her breast condition on October 22, 1986, defendants' failure to diagnose breast cancer is conduct to which section 6-106(a) immunity applies." *Michigan Avenue National Bank*, 191 Ill. 2d at 516.

¶ 55 Similarly here, although plaintiff argues that "this is not a failure to diagnose case, but instead a negligent and inadequate treatment situation," the gravamen of her fifth amended complaint is that defendants' failure either to perform examinations or to adequately perform examinations led to their failure to diagnose and treat plaintiff's spinal cord injury, which, in turn, proximately caused her claimed injuries.[10] The import of all these allegations is that defendants' failure to properly perform an initial examination of plaintiff, screen her and consult with a spine expert prevented them from reaching a correct diagnosis of spinal cord injury. Only because defendants failed to

---

[10] In the fifth amended complaint, plaintiff claimed she suffered injuries as a proximate result of one or more of the following negligent acts or omissions by Drs. Bishof and Bankoff and/or the county:

"a. Failing to properly perform an initial medical screening examination; or
b. Failing to properly screen [her] for her signs and symptoms; or
c. Failing to properly treat [her] for her signs and symptoms; or
d. Failing to properly treat [her] for a spinal cord injury; or
e. Failing to properly consult with a neurologist or neurosurgeon for [her] signs and symptoms; or
f. Failing to refer [her] to a neurologist or neurosurgeon for treatment of her signs and symptoms ***."

diagnose the spinal cord injury did they fail to properly treat plaintiff's signs and symptoms, properly treat her spinal cord injury and properly refer her to a neurologist or neurosurgeon. Only because defendants failed to properly diagnose and treat plaintiff for a spinal cord injury did she suffer her ultimate injuries. In plaintiff's reply brief, she states that "the crux" of her case is her allegation that defendants' treatment for their diagnoses of muscle spasm and back/buttock contusion was negligent. Yet nowhere in her complaint has she alleged that that the treatment provided to her was improper treatment for the muscle spasm and back/buttock contusion diagnoses. Moreover, as discussed in detail below, her experts have stated no opinion that the treatment she received was inadequate and negligent for a muscle spasm and back/buttock contusion injury.

¶ 56      If defendants began treating plaintiff for their diagnosis of muscle spasm and back/buttock contusion, then they are not immune from liability for negligently prescribing or administering that treatment, including negligently examining her in the course of that treatment. Plaintiff argues, therefore, that defendants should have ordered more diagnostic testing of and made subsequent examinations of her when her condition did not improve after the initial diagnosis and treatment and they are not immune for their failure to do so. She points to her expert witness Dr. Corre's testimony that defendants should have conducted more tests and examinations on plaintiff based on the symptoms that they were treating to rule out a spinal cord injury and that they were negligent for failing to order an MRI of her spine and to consult a spine specialist. This testimony by Dr. Corre is evidence that defendants failed to adequately examine

plaintiff, for which they are immune under section 6-105.[11] It is not evidence that defendants negligently treated plaintiff for their diagnosis.

¶ 57    At oral argument, citing page 2596 of the record, plaintiff asserted Dr. Upton had testified that defendants' treatment of plaintiff deviated from the standard of care for her diagnosed condition of back/buttock contusion, specifically that he testified plaintiff should have been immobilized and given steroids for her diagnosed condition. This contention is not supported by the record. On page 2596 of the record, Dr. Upton testified in his discovery deposition that *Dr. Fishman* should have immobilized plaintiff as "[t]his is standard treatment of all *spinal cord lesions.*" (Emphasis added.) Dr. Fishman is the doctor who examined plaintiff at Lincoln Park Hospital, he was not employed at Stroger Hospital and he is not a party to this appeal. Nowhere on page 2596 of the record does Dr. Upton state that anyone, let alone defendants, should have immobilized plaintiff and administered steroids to her for her back/buttock contusion diagnosis. The only arguably relevant opinion stated by Dr. Upton on page 2596 is his

---

[11]    Based on the deposition testimony of Drs. Corre and Upton, we consider an MRI to be a diagnostic tool and defendants' failure to order an MRI to be a failure to perform a diagnostic step. Dr. Corre testified "[t]he medical screening examination required a complete and detailed history, a complete and detailed physical exam. It required imaging which included an MRI of the spine. It required stat consultation with a spine specialist." He also testified that "the imaging that was performed on the initial evaluation was inadequate and should have included an MRI." He stated that, if plaintiff had been diagnosed with a spinal cord contusion without an MRI, then the MRI did not have to be done immediately. However, since Dr. Bishof did not make that diagnosis, it was Dr. Corre's opinion that "it would have been appropriate and standard to have gotten the test."

Dr. Upton testified similarly, stating that, as he would have known from the "evidence" that plaintiff had a spinal cord lesion, for him, "the MRI isn't the way of making the diagnosis" but rather " a way of confirming or denying the clinical diagnosis which is that there's a spinal cord injury." However, as Dr. Bishof did not know what was wrong with plaintiff and did not "have enough evidence" and "didn't come up with a clear diagnosis about spinal cord at all," it was Dr. Upton's opinion that "the MRI should be a way of helping [her] see what is going on."

explanation that indications that a patient should be immobilized are "if you don't know what is wrong with their nervous system and you think they've had an injury, it is standard practice to do just exactly that" and "you might believe they have a fracture or dislocation" or an "acute disc herniation" and immobilization "also applies if there's a spinal cord swelling." But again, he did not specifically tie these statements to treatment of a diagnosed back/buttock contusion, only to Dr. Fishman's inadequate treatment of plaintiff's spinal cord injury.

¶ 58    At oral argument, plaintiff also asserted generally, without further citation to the record, that Drs. Upton and Corre testified that defendants' failure to immobilize plaintiff or administer steroids to her was negligent and in violation of the standard of care for treatment of her diagnosed back/buttock contusion. Neither doctor stated this opinion in his deposition. Dr. Upton's only reference to the need to immobilize plaintiff was in his testimony regarding Dr. Fishman cited above in the context of a spinal cord injury. His assorted statements that defendants should have administered steroids to plaintiff were made in the context of defendants' initial examination of plaintiff and their failure to properly diagnose and treat her spinal cord contusion. He did not testify that defendants should have administered steroids to plaintiff as part of their treatment for her diagnosed back/buttock contusion.

¶ 59    Similarly, Dr. Corre never testified that defendants' failure to immobilize plaintiff or administer steroids to her was negligent treatment in violation of the standard of care for a diagnosed back/buttock contusion. Although he testified many times that defendants should have immobilized plaintiff, stabilized her spine and given her high-dose steroids, he stated these opinions in the context of defendants' failure to properly

examine, diagnose and treat her spinal cord contusion/injury. He did not testify that such treatment is required for a muscle spasm or a back/buttock contusion and his testimony is not evidence that defendants were negligent in treating for plaintiff's, in retrospect incorrect, back/buttock contusion diagnosis.

¶ 60    As in *Michigan Avenue National Bank*, and unlike in *American Bank & Trust Co.*, there was never a correct diagnosis here for which treatment was prescribed and negligently rendered. Following *Michigan Avenue National Bank*, defendants are immune from liability under section 6-106(a) for their failure to diagnose plaintiff's spinal cord injury and their misdiagnosis of her injury as a muscle spasm and/or back/buttock contusion. See also *Mabry v. County of Cook*, 315 Ill. App. 3d 42 (2000) (doctors at a public hospital diagnosed a patient with asthma but the patient died of undiagnosed pulmonary embolism; the court found the defendants immune from liability for failure to treat a condition they had not diagnosed, finding that the alleged negligence was based not on treatment actually received for asthma but on treatment that should have been received and diagnosis that should have been made).

¶ 61    Although plaintiff need not prove her entire case at the summary judgment stage, she must still present a factual basis that could arguably entitle her to judgment in her favor. *Wallace v. Alexian Brothers Medical Center,* 389 Ill. App. 3d 1081, 1086 (2009). Construing the pleadings, depositions, admissions and affidavits strictly against defendants and liberally in favor of plaintiff, we find plaintiff has failed to present evidence to show that defendants were negligent in treating her diagnosed condition. The court did not err in finding defendants immune from liability under section 6-105 (failure to conduct an adequate examination) and section 6-106(a) (failure to diagnose)

for the negligence asserted in counts I and III. We affirm the trial court's grant of summary judgment to defendants on counts I and III.

¶ 62                    2. Counts II and IV – Negligent Infliction of Emotional Distress

¶ 63        Next, we consider the trial court's grant of summary judgment to defendants on counts II and IV of the fifth amended complaint pleading negligent infliction of emotional distress. The court held that counts II and IV were "not pled" as claims for negligent infliction of emotional distress but, rather, except for an additional allegation of emotional distress as an element of damages, were identical to counts I and III sounding in negligent medical malpractice. As the negligent infliction of emotional distress counts stemmed from the same failure to adequately examine, test and diagnose asserted by plaintiff in her negligence counts and the allegations in the four counts were identical, the court held that defendants immunized from liability pursuant to sections 6-105 and 6-106.

¶ 64        Illinois applies a "general-negligence approach to a claim of negligent infliction of emotional distress raised by a direct victim of the defendant's negligence." *Thornton v. Garcini*, 382 Ill. App. 3d 813, 817 (2008), *aff'd,* 237 Ill. 2d 100 (2010) (citing *Corgan v. Muehling,* 143 Ill. 2d 296, 306 (1991)). For a direct victim, such as plaintiff here, to state a claim for negligent infliction of emotional distress, she must allege that: (1) the defendant owed her a duty; (2) the defendant breached that duty; and (3) her injury was proximately caused by that breach. *Parks v. Kownacki*, 193 Ill. 2d 164, 181 (2000) (citing *Corgan,* 143 Ill. 2d at 306). "Whether a duty exists is a question of law for the court to decide." *Washington v. City of Chicago*, 188 Ill. 2d 235, 239 (1999). In resolving whether a duty should be imposed, "a court must determine whether there is a

relationship between the parties requiring that a legal obligation be imposed upon one for the benefit of the other," taking into consideration factors including "the reasonable foreseeability of injury, the likelihood of such injury, the magnitude of guarding against the injury, and the consequences of placing that burden on the defendant." *Id.* If the victim has not alleged facts sufficient to impose a duty on the defendants, she has failed to state a claim and her action should be dismissed. *Parks*, 193 Ill. 2d at 181. "[U]nless a duty is owed, there is no negligence [citation], and plaintiffs cannot recover as a matter of law [citation]." (Internal quotation marks omitted.) *Washington*, 188 Ill. 2d at 239.

¶ 65    Plaintiff's claims for negligent infliction of emotional distress are nothing more than a recasting of her medical negligence claims for which defendants have immunity. Except for the addition of an allegation that plaintiff suffered and would continue to suffer severe mental and emotional anguish due to her injuries proximately resulting from defendants' negligent acts or omissions, plaintiff's allegations in her negligent infliction of emotional distress counts were, as the trial court found, identical to the allegations in her medical negligence counts. In both plaintiff's medical negligence and negligent infliction of emotional distress counts, she alleged that Drs. Bishof and Bankoff "had the duty to possess and apply the knowledge and use the skill of a reasonable well qualified emergency room physician under the same or similar circumstances" and were negligent in failing to: (1) properly perform an initial medical screening examination; (2) properly screen her for her signs and symptoms; (3) properly treat her for her signs and symptoms; (4) properly treat her for a spinal cord injury; (5) properly consult with a neurologist or neurosurgeon for her signs and symptoms; or (6)

refer her to a neurologist or neurosurgeon for treatment of her signs and symptoms.

¶ 66    Plaintiff makes many of the same assertions in her argument here as she did in supporting her medical negligence claims (resolved in section 1 *supra*). Specifically, she asserts that her experts' testimony that she had a spinal cord injury rather than a muscle spasm or back/buttock contusion and that Drs. Bishof and Bankoff should have immobilized her spine, ordered an MRI or further testing, administered steroids and consulted with a spine specialist shows defendants clearly undertook treatment of her, this treatment was negligent and defendants are not immune from liability for the negligent treatment and the emotional distress resulting from it. As we have already determined, defendants are immune from liability for these alleged negligent "treatments." The testimony of plaintiff's expert witnesses showed that defendants were negligent in failing to diagnose her with a spinal cord injury and in treating a spinal cord injury but did not show that defendants were negligent in treating her for her diagnosed condition, muscle spasm and/or back/buttock contusion. We, therefore, found defendants immune from liability pursuant to section 6-105 for their failures to adequately examine plaintiff and immune from liability pursuant to section 6-106(a) for their failure to correctly diagnose her. There being no evidence that the treatment defendants undertook for the muscle spasm and/or back/buttock contusion diagnosis was negligent for that diagnosis, we found no basis on which to impose the limitation on immunity provided in section 6-106(d).

¶ 67    As additional evidence that defendants treated her negligently and she suffered severe emotional distress as a result, plaintiff points to her testimony that the doctors did not believe her, ordered her to stand when she could not, dropped her when she

could not stand, accused her of lying, would not listen to her and insisted there was nothing wrong with her. She points to her testimony that, as a result of how she was treated, she has no self-confidence anymore, feels no one will believe her or put faith and trust in her, that people think she is a "phony" and that she has to defend or explain herself. She points to her testimony that, while she was at Oak Park Hospital, she spoke to a psychologist for "these" emotional problems on a regular basis. She also points to Oak Park Hospital psychologist Dr. Brachman's testimony that plaintiff's injury probably exacerbated her existing mental conditions and Dr. Corre's testimony that defendants failed to take her seriously. In *American National Bank & Trust Co.*, 327 Ill. App. 3d at 220, the court held, "[u]nder section 6-106(d), in the course of administering the treatment prescribed there is no immunity if the subsequent prescription or examination was incorrectly made (a negligent or wrongful act) or if the prescription or examination was not made at all (an act of omission)." On this basis, plaintiff argues that defendants "were very insulting" to her and this negligent treatment, in addition to the negligent treatment defendants prescribed for her signs and symptoms, caused her severe emotional distress for which defendants are not immunized under the Tort Immunity Act.

¶ 68    In order to show negligent infliction of emotional distress, plaintiff must show defendants had a duty toward her, they breached that duty and she suffered injury as a proximate result of that breach. *Parks*, 193 Ill. 2d at 181. Although plaintiff does not articulate her argument as such, she appears to be suggesting, without citation to legal authority or evidentiary support, that defendants had a duty to believe her and not to question the sincerity of her complaints. She appears to argue that the manner in which defendants spoke to her and addressed her concerns was part of the "treatment" they

provided to her, they were negligent in this "insulting" treatment and she suffered emotional distress as a result.

¶ 69      Plaintiff, however, makes no argument regarding the existence of a physician's duty to treat her politely or, at a minimum, not to treat her rudely, or a duty to believe her. At most, her assertion is that the doctors offended her in assorted ways and that she suffered severe emotional distress as a result. Although plaintiff's expert witnesses testified in depth regarding defendants' violations of the standard of care applicable to an emergency room physician's examination, treatment and diagnosis of a patient presenting with plaintiff's signs and symptoms, they did not testify that a standard of care exists for an emergency room physician's deportment toward a patient. They did not testify that an emergency room physician in defendants' circumstances has a duty to believe and not question the sincerity of a patient's complaints or that the standard of care so requires, let alone that defendants breached this standard of care.

¶ 70      Plaintiff asserted at oral argument, without citation to the record, that Drs. Upton and Corre testified that defendants' failure to take plaintiff seriously was a violation of the standard of care. The closest Dr. Upton came to stating such is his testimony that "*the management here* required, optimal management required recognition of the problem, not thinking it's fictitious." (Emphasis added.) However, Dr. Upton stated this opinion specifically in the context of plaintiff's visit to Dr. Fishman, who had noted in plaintiff's medical record his diagnosis of "numbness, possibly fictitious." Further, even if this opinion could arguably apply to defendants' "management" of plaintiff, it is an opinion based on the particular "management here," *i.e.*, the circumstances of plaintiff's case, and is not a general statement that physicians have a duty to believe a patient or

take her seriously, let alone a duty to do so against their own professional judgment.

¶ 71    With regard to Dr. Corre's testimony, he testified that there was a "blatant failure" by defendants to take plaintiff seriously and this was a deviation from the standard of care. He defined this deviation in some detail, closing with "not one person *** takes this [plaintiff's] compendium of signs and symptoms and mechanisms and findings and considered seriously that the patient could have a spinal cord contusion, spinal cord injury." Although Dr. Corre testified that defendants violated the standard of care by not taking plaintiff seriously, his opinion was based on the specific circumstances of her case, on the "compendium of signs and symptoms and mechanisms and findings" she presented with. His opinion was not a general statement that physicians have a duty to believe a patient even though their findings or professional experience show otherwise. Moreover, a duty to take a patient seriously is not the same as a duty to believe a patient. Given the number of tests and examinations defendants conducted of plaintiff, it appears they did initially take her seriously but then, when the tests results did not support her complaints, determined she was not believable. This, therefore, in a circular way, brings the analysis back to failure to diagnose or misdiagnosis, which is immunized. Plaintiff's allegations are insufficient to show any duty breached by defendants when they "insulted" or did not believe her and, therefore, are insufficient to state a claim for negligent infliction of emotional distress.

¶ 72    In determining whether a duty should be imposed, we must determine whether there is a relationship between the parties requiring that a legal obligation be imposed on one party for the benefit of the other, taking into consideration factors including "the reasonable foreseeability of injury, the likelihood of such injury, the magnitude of

43

guarding against the injury, and the consequences of placing that burden on the defendant." *Washington*, 188 Ill. 2d at 239. As a result of the particular relationship between a physician and patient at issue here, the law imposes on a physician the duty to exercise due care in attending to the needs of his or her patient. *Nichelson v. Curtis*, 117 Ill. App. 3d 100, 104 (1983). However, there is no legal authority imposing a duty on physicians to believe a patient contrary to their own medical judgment and experience or to accept without question the sincerity of a patient's complaints. Other than the recognized standard of care, we decline to impose on physicians an additional duty to believe a patient or not to question a patient's sincerity for fear of the remote chance that this may cause the patient emotional distress. In considering the consequences of imposing such a burden on the medical profession, we find the imposition of such a duty would have a chaotic effect upon the practice of medicine in that medical professionals would be unable to question the sincerity of any patient's complaints. The magnitude of the negative effect imposing such a duty would have on the medical profession vastly outweighs the remote possibility that a patient may suffer emotional distress if the duty is not imposed.

¶ 73    Construing the pleadings, depositions, admissions and affidavits strictly against defendants and liberally in favor of plaintiff, we find plaintiff has not sufficiently alleged the existence of a duty requiring defendants to comport themselves in a courteous manner towards her or to believe her. Accordingly, given that defendants are immune from liability for their "physical" treatment and that plaintiff has not sufficiently alleged that defendants had a duty to comport themselves towards her in any particular manner or to believe her complaints, the court did not err in granting summary judgment to

defendants on the negligent infliction of emotional distress counts II and IV.[12]

¶ 74                                3. Count V – EMTALA

¶ 75        Lastly, we consider whether the trial court erred in granting summary judgment to the county on count V of the fifth amended complaint, in which plaintiff alleged the county violated EMTALA. The court found EMTALA applied to the county but that plaintiff failed to show that the medical screening examination she received at Stroger Hospital violated EMTALA or that she required stabilization for an emergency medical condition prior to her discharge from the emergency room as required by EMTALA.

¶ 76        At Stroger Hospital, the county offers emergency room services. "Where emergency room services are offered, a certain level of health care is required to be provided to every person who seeks treatment there. That is so as a matter of both state (210 ILCS 80/1 (West 2002); see also 210 ILCS 70/1 (West 2002)) and federal (42 U.S.C. § 1395dd) law." *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 375 (2010). Codified at 42 U.S.C. § 1395dd, EMTALA is that federal law. *Jinkins v. Evangelical Hospitals Corp.*, 336 Ill. App. 3d 377, 385 (2002). In order to prevent patient dumping, "EMTALA prohibits hospitals from rejecting patients suffering from emergency medical conditions without first stabilizing or transferring the patients." *Arellano v. Department of Human Services,* 402 Ill. App. 3d 665, 675 (2010).

---

[12] We will not address the question of whether section 6-109 of the Tort Immunity Act applies here. Section 6-109 provides for immunity for a local public entity and its employees "for an injury resulting from the failure to admit a person to a medical facility operated or maintained by a local public entity." 745 ILCS 10/6-109 (West 2012). Defendants raised this immunity in their motion for summary judgment, asserting that plaintiff's claim for negligent infliction of emotional distress was based on defendants' failure to admit her to the hospital. As the trial court found and plaintiff points out in her reply brief on appeal, her arguments were not based on defendants' failure to admit her to the hospital.

" 'Patient dumping' refers to the practice of a hospital that, despite its capability to provide needed medical care, either refuses to see or transfers a patient to another institution because of the patient's inability to pay. Congress sought to end patient dumping by requiring any hospital receiving federal funds to examine patients who seek treatment in an emergency department and treat any serious medical condition detected." *Baber v. Hospital Corp. of America*, 977 F.2d 872, 873, n.1 (4th Cir. 1992) (citing Melissa K. Stull, Annotation, *Construction and Application of Emergency Treatment and Active Labor Act (42 USCS § 1395dd)*, 104 A.L.R. Fed. 166, 175 (1991)).

EMTALA allows a plaintiff to recover any damages she is entitled to under state law as a result of a hospital's failure to comply with EMTALA. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 944 (6th Cir. 1995) (citing 42 U.S.C. § 1395dd(d)(2)(A) (1994)).

¶ 77    EMTALA requires:

"In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists." 42 U.S.C.

§ 1395dd(a) (2012).

"If any individual *** comes to a hospital and the hospital determines that the individual has an emergency medical condition," then the hospital must provide "further medical examination and such treatment as may be required to stabilize the medical condition" or an appropriate transfer of that patient after the patient has been "stabilized." 42 U.S.C. § 1395dd(b)(1), (c) (2012).

¶ 78       As the trial court found, EMTALA applies to the county. EMTALA provides in section 1395dd(f) that its provisions "do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f) (2012). The only court to have addressed the question of whether EMTALA preempts sections 6-105 and 6-106 of the Tort Immunity Act is the United States District Court for the Northern District of Illinois in *Williams v. County of Cook*, No. 97-C-1069, 1997 WL 428534 (N.D. Ill. July 24, 1997). Although decisions of the United States District Court and Court of Appeals are not binding on state courts, they can provide guidance and serve as persuasive authority. *People v. Criss*, 307 Ill. App. 3d 888, 900 (1999).

¶ 79       In *Williams*, as here, the county argued it was immune from EMTALA liability pursuant to sections 6-105 and 6-106 of the Tort Immunity Act because it was being sued as a local public entity that operates a public medical facility. *Williams*, 1997 WL 428534, at *5. The court held EMTALA preempts sections 6-105 and 6-106, explaining:

        "Under the Illinois Tort Immunity Act, local public entities are not liable for injury resulting from the failure to make a physical or mental examination, 745 ILCS § 10/6-105, the failure to diagnose or treat, 745 ILCS § 10/6-

106, or the failure to admit a person to a medical facility, 745 ILCS § 10/6-109. EMTALA preempts state or local law requirements that directly conflict with its requirements. 42 U.S.C. § 1395dd(f). EMTALA requires hospitals to provide all emergency room patients with appropriate medical screening examinations and to stabilize any emergency medical conditions discovered before transfer or discharge. In direct conflict with EMTALA, the Illinois Tort Immunity Act purports to relieve public hospitals from liability for the failure to screen, examine, treat or admit. The Illinois Tort Immunity Act is preempted and does not shield Cook County from EMTALA violations." *Williams*, 1997 WL 428534, at *5.

¶ 80     We agree that, by immunizing public hospitals from liability for failure to screen, examine, treat or admit, sections 6-105 and 6-106 directly conflict with EMTALA's requirement that all hospital emergency departments must provide "an appropriate medical screening examination within the capability of the hospital's emergency department" (42 U.S.C. § 1395dd(a) (2012)) to determine whether an emergency medical condition exists. Therefore, pursuant to section 1395dd(f) of EMTALA, EMTALA preempts sections 6-105 and 6-106 of the Tort Immunity Act and EMTALA's requirements apply to the county.

¶ 81     Plaintiff argues that the court erred in granting the county's motion for summary judgment on the basis that there is no evidence to support a violation of EMTALA. Plaintiff argues a question of fact exists regarding whether defendants' medical screening examination was in accordance with EMTALA, *i.e.*, whether their medical screening examination was "an appropriate medical screening examination within the

capability of the hospital's emergency department, including ancillary services routinely available to the emergency department" (42 U.S.C. § 1395dd(a) (2012)), which plaintiff asserts included a neurology or neurosurgical consultation and an MRI test. She argues the court erred in finding her expert witness Dr. Corre's criticisms only went to the issues of negligent screening and misdiagnosis "when his testimony was clear as to the Defendants' violations of EMTALA." She also argues a question of fact exists regarding whether defendants stabilized her prior to discharging her as required by EMTALA.

¶ 82    We find plaintiff raises no genuine issue of material fact regarding whether the Stroger Hospital emergency department gave plaintiff an "appropriate medical screening examination" under EMTALA. EMTALA does not define the term other than to state the purpose of this examination is to determine whether or not an emergency medical condition exists. *Baber v. Hospital Corp. of America*, 977 F.2d 872, 879 (1992) (4th Cir. 1992). EMTALA defines "emergency medical condition" as, in relevant part:

"a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

(i) placing the health of the individual *** in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part[.[" 42 U.S.C. § 1395dd(e)(1)(A) (2012).

The goal of "an appropriate medical screening examination" under EMTALA, therefore, "is to determine whether a patient with acute or severe symptoms has a life threatening or serious medical condition." *Baber*, 977 F.2d at 879. To that end, EMTALA essentially

requires that a hospital develop a screening procedure "designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints." *Id.*

¶ 83    EMTALA does not impose a national standard of care in screening patients and, instead, requires that a hospital will provide a screening procedure "appropriate" and "within the capability" of the particular hospital's emergency department and its available ancillary services. *Baber*, 977 F.2d at 879-80. Although a hospital may have one general screening procedure for all patients, it may tailor that procedure to each patient's complaints or symptoms. *Id.* at 879 n.6. "[S]uch varying screening procedures would not impose liability under EMTALA as long as all patients complaining of the same problem or exhibiting the same symptoms receive identical screening procedures." *Id.*

¶ 84    Application of a hospital's screening procedures involves the hospital personnel's use of medical judgment and training to assess a patient's signs and symptoms to determine whether an emergency medical condition exists. *Baber*, 977 F.2d at 879. EMTALA does not, however, "guarantee that the emergency personnel will correctly diagnose a patient's condition as a result of this screening." *Id.* EMTALA is not a federal malpractice statute. *Repp v. Anadarko Municipal Hospital*, 43 F.3d 519, 522 (10th Cir. 1994). It was intended to address patient dumping and guarantee that all patients receive an adequate first response to a medical crisis and ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances, not to guarantee that they will be correctly diagnosed "or even to ensure that they receive adequate care." *Baber*, 977 F.2d at 880; *Gatewood v. Washington*

*Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991). "Thus, what constitutes an 'appropriate' screening is properly determined not by reference to particular outcomes, but instead by reference to a hospital's standard screening procedures." *Gatewood*, 933 F.2d at 1041; see also *Repp*, 43 F.3d at 522. A hospital provides "appropriate medical screening" under EMTALA when it follows its standard emergency room screening procedures, applying its standard procedure uniformly to all patients in similar medical circumstances. *Repp*, 43 F.3d at 522; *Baber*, 977 F.2d at 881; *Gatewood*, 933 F.2d at 1041. Although a hospital violates EMTALA when it does not follow its own standard policies, "[m]ere *de minimus* variations" or "slight deviation" from the hospital's standard procedures do not amount to a violation of hospital policy. *Repp*, 43 F.3d at 523.

¶ 85    It is uncontested that defendants performed a medical screening examination on plaintiff when she presented to the Stroger Hospital emergency department. Plaintiffs' experts Drs. Upton and Corre consistently testified, and her emergency department medical record shows, that the emergency department, through Drs. Bishof and Bankoff, made multiple physical examinations and observations of plaintiff and employed X-rays, a CAT scan, pain medication and a muscle relaxant in an effort to determine what was wrong with her. The fact that, in retrospect, the examinations might have been incomplete or resulted in a misdiagnosis does not determine whether a medical screening examination satisfies EMTALA. EMTALA's requirement for an appropriate medical screening examination is " 'not designed to redress an incorrect diagnosis by a hospital; instead, it is merely an entitlement to receive the same treatment that is accorded to others similarly situated.' " *Baber*, 977 F.2d at 880 (quoting *Jones v. Wake County Hospital Systems, Inc.*, 786 F. Supp. 538, 544 (E.D.N.C. 1991)).

A hospital satisfies EMTALA's screening requirement "if its standard medical screening procedure is applied uniformly to all patients in similar medical circumstances." *Baber*, 977 F.2d at 881. Therefore, in order to show that the screening examination or treatment she received at Stroger Hospital violated EMTALA, plaintiff must show that the hospital did not comply with its own standard screening procedure or that it treated her differently from similarly situated patients. She makes no such showing here.

¶ 86 First, in her brief on appeal, plaintiff does not argue, let alone show, that she was examined or treated any differently than similarly situated patients. Second, the record does not support plaintiff's assertion at oral argument that Dr. Bankoff admitted in his discovery deposition that, although he usually performed a neurological examination on patients such as plaintiff, he did not perform such an examination on plaintiff. Plaintiff cited to pages 2660-61 of the record, but in those pages, Dr. Bankoff testified that he *did* do his usual neurologic examination on plaintiff. He first explained that he did not remember plaintiff, did not remember examining her and could only testify regarding what he had written in plaintiff's medical record. Then, on page 2660 of the record, when asked how he had determined that plaintiff had a "lack of numbness" as he had noted in her medical record, he stated "I did a neurologic exam." He explained that "[c]ustom and practice for me on any patient in a neurologic exam would include a sensory evaluation" and "I documented a 'normal exam' [in the record], that would indicate a normal neurologic exam." He acknowledged that he had not documented "neuro normal" or the particulars of his exam in plaintiff's medical record, only "normal exam" but testified that, had he determined "sensory abnormalities," he "wouldn't have written a normal exam." Taken together, Dr. Bankoff's testimony was that he usually

performed a neurological examination including a sensory evaluation on patients such as plaintiff and that he did perform such an examination on plaintiff here.

¶ 87        Third, although plaintiff argues that the court improperly disregarded Dr. Corre's testimony regarding whether there was an appropriate screening examination under EMTALA, DR. Corre's testimony does not raise any questions of fact regarding whether the screening was appropriate under EMTALA. Dr. Corre testified at length regarding how the inadequacies of the screening examination given to plaintiff and defendants' failure to immobilize and stabilize her spine, order an MRI and consult with spine experts violated both the standard of care and EMTALA. However, he did not testify that the medical screening examination accorded to plaintiff was different than the medical screening examination the emergency department at Stroger Hospital would provide for any other patient presenting with the same complaints, signs and symptoms. Nor did he testify that defendants violated Stroger Hospital's own standard medical screening policy or that they deviated from the hospital's custom and practice in treating emergency room patients with similar complaints and symptoms. All of Dr. Corre's EMTALA opinions were based on his professional opinion of what the hospital should have done and not on what it usually did in similar circumstances or was required by do by its own policies.

¶ 88        EMTALA " 'is neither a malpractice nor a negligence statute.' " *Repp*, 43 F.3d at 522 (quoting *Urban v. King,* No. 93-3331, 1994 WL 617521, at *2 (10th Cir. Nov. 8, 1994)). Thus, while Dr. Corre's opinion and testimony may create an issue with regard to whether Stroger Hospital's examination, treatment and misdiagnosis of plaintiff deviated from medical standards of care, it does not create a material question of fact

as to whether the hospital emergency department personnel violated EMTALA by failing to provide an "appropriate" medical examination.[13] Questions regarding whether hospital personnel properly diagnosed or treated a patients are to be resolved under state negligence and medical malpractice theories of recovery, not EMTALA. *Baber*, 977 F.2d at 880.

¶ 89    Pointing to Stroger Hospital's eight-page policy on EMTALA, plaintiff argues that she provided evidence that the screening examination performed on her violated the policy. The hospital's policy quotes much of EMTALA verbatim and defines and explains the EMTALA terms and requirements in detail. In a section labeled "procedure," the policy sets forth the steps to be followed when a patient presents to the emergency room. In the first step, "Medical Screening," the policy requires that "[a]ny person who comes to the emergency department requesting examination or treatment of a medical condition (or where such a request is made on their behalf) shall receive a Medical Screening." It provides that, "[o]nce the Medical Screening is completed and there is a determination the patient *does not* have an Emergency Medical Condition the patient may be treated, discharged or transferred as appropriate for the their medical condition" and, "[i]f the patient *has* an emergency medical condition, the patient is to *** receive further examination and treatment as required to Stabilize their medical condition; or *** be transferred." (Emphases in original.)

¶ 90    EMTALA does not define "medical screening" but the hospital's EMTALA policy does, as follows:

---

[13]    The testimony of plaintiff's other expert witness, Dr. Upton, is similarly deficient. Although Dr. Upton found the hospital's medical screening examination of plaintiff to be inadequate, he did not state this opinion in the context of EMTALA and, in fact, made no reference to EMTALA or Stroger Hospital's policies at all.

" 'Medical Screening' means the appropriate process (examination and evaluation of the patient) used by a Qualified Medical Person within the capability of the hospital's emergency department (services and staff) including ancillary services routinely available to the emergency department to determine whether or not the patient has an Emergency Medical Condition.

Medical Screening is a process that is reasonably calculated to determine whether an Emergency Medical Condition exists and represents the use of a spectrum of activities and personnel indicated by the needs of the particular patient. The Medical Screening for a patient is to be consistent with that provided to other patients with similar medical conditions. A Medical Screening also includes documentation on Emergency Department ('ED') log, triage and ED records of the above as well as final patient disposition."

In a section of the policy titled "Requests for Medical Treatment at Bureau Hospitals," it is provided that "the Medical Screening is a process engaged in until an Emergency Medical Condition has been diagnosed or ruled out."

¶ 91    As noted above, plaintiff presents no testimony from her expert witnesses stating that defendants' medical screening examination and treatment of plaintiff did not comply with the hospital's EMTALA policy. Instead, she cites to the policy's provisions providing that (a) to "stabilize" a person with an emergency condition means, in part, to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the patient and that transfer includes discharge of a patient and (b) medical screening is a process engaged in until an

emergency medical condition has been diagnosed or ruled out. She argues that defendants failed to either diagnose or rule out an emergency medical condition and, therefore, they violated their own policy on EMTALA, thus presenting a question of fact precluding entry of summary judgment to defendants.

¶ 92 Plaintiff appears to argue that, unless and until Stroger Hospitals' emergency department personnel memorialize in some fashion that they have (a) provided such medical treatment to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer or discharge and (b) diagnosed or ruled out that a patient suffers from an emergency condition, a question of fact exists regarding whether the department did indeed diagnose or rule out an emergency condition as required by the policy. There is no support for this argument.

¶ 93 The hospital policy's definition of "stabilize" is the same as that set forth in EMTALA.[14] Neither the policy nor EMTALA states a requirement that emergency department personnel must memorialize, whether in the patient's record or verbally or by any other means, that they have provided the medical treatment necessary to assure, with reasonable medical probability, that the patient will not likely suffer material deterioration of her condition from or during transfer or discharge. Neither the policy nor

---

[14] EMTALA defines "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A) (2012). It defines "stabilized" as "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(B) (2012). "Transfer" includes the discharge of a patient. 42 U.S.C. § 1395dd(e)(4) (2012).

EMTALA require that a determination regarding whether an emergency medical condition has been diagnosed or ruled out must be memorialized.

¶ 94    All that is required under EMTALA is that a decision regarding the existence of an emergency medical condition be made after an appropriate medical screening examination, "[n]othing more, nothing less." *Collins v. DePaul Hospital*, 963 F.2d 303, 306-07 (10th Cir. 1992). Stroger Hospital's policy provides the same. It is obvious here that, after its screening examination, the hospital determined that an emergency medical condition did not exist. In asserting that the hospital misdiagnosed her by failing to find she had an emergency medical condition, plaintiff admits that it decided an emergency medical condition did not exist. Further, her testimony that both Dr. Bankoff and the "second male doctor" did not believe her, told her there was nothing wrong with her, told her she was lying and discharged her with instructions to take Motrin and see her internist shows that, in compliance with the hospital's EMTALA policy, the doctors in the emergency department reached a determination regarding whether plaintiff had an emergency medical condition by ruling out the condition.

¶ 95    With regard to plaintiff's assertion that Stroger Hospital violated EMTALA when it failed to stabilize her prior to discharge, her assertion that the hospital did not diagnose her with an emergency medical condition precludes finding the hospital liable for failure to stabilize plaintiff prior to her discharge. EMTALA requires that, if a hospital determines that an emergency department patient has an emergency medical condition, it must provide "further medical examination and such treatment as may be required to stabilize the medical condition" or an appropriate transfer (or discharge) of that patient after the patient has been "stabilized." 42 U.S.C. § 1395dd(b)(1), (c) (2012). The

requirement that a hospital stabilize a patient prior to transfer or discharge is " 'triggered only after a hospital determines that an individual has an emergency medical condition.' " *Baber*, 977 F.2d. at 883 (quoting *Gatewood*, 933 F.2d at 1041). "[U]nless the hospital actually determines that the patient suffers from an emergency medical condition," the requirement does not apply. *Baber*, 977 F.2d at 883; also *Barrios v. Sherman Hospital*, No. 06 C 2853, 2009 WL 935750, at *4 (N.D. Ill. Apr. 3, 2009).

¶ 96    Plaintiff has not shown that Stroger Hospital had actual knowledge that she had an emergency medical condition at the time it discharged her. It may be that, had Drs. Bishof and Bankoff performed the medical screening examination and testing to Drs. Corre and Upton's satisfaction, they would have determined that plaintiff did, in fact, have an emergency medical condition requiring stabilization. Nevertheless, "[a]nalysis by hindsight is not sufficient to impose liability under EMTALA." *Baber*, 977 F.2d at 883. Plaintiff's own argument and testimony show that the doctors in the emergency department determined that she did not have an emergency medical condition. Therefore, as plaintiff has not shown that the hospital knew she had an emergency condition, the hospital cannot be liable for any failure to provide stabilizing treatment under EMTALA. *Id.* at 884; *Barrios*, 2009 WL 935750, at *4; *Anadumaka v. Edgewater Operating Co.*, 823 F. Supp. 507, 510 (N.D. Ill. 1993).

¶ 97    The court did not err in finding plaintiff failed to show that the county violated EMTALA in its medical examination of plaintiff or its failure to stabilize her prior to discharge. We affirm the trial court's grant of summary judgment to the county on count V of the fifth amended complaint.

¶ 98                                    CONCLUSION

¶ 99 For the reasons stated above, we affirm the orders of the trial court granting summary judgment to Dr. Bishof on counts I and II of the fifth amended complaint, to Dr. Bankoff on counts III and IV of the fifth emended complaint and to the county on the counts I through V of the fifth amended complaint.

¶ 100 Affirmed.